IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AMARSAIKHAN TSOLMON, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-3434 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

This Federal Tort Claims Act ("FTCA") case is before the Court on the Motion to Dismiss or for Summary Judgment ("Defendant's Motion") [Doc. # 28] filed by Defendant United States of America ("Defendant" or the "Government") and the Motion for Summary Judgment ("Plaintiff's Motion") [Doc. # 29] filed by Plaintiff Amarsaikhan Tsolmon ("Plaintiff" or "Tsolmon") [Doc. # 29]. Both motions have been fully briefed and are ripe for review.[1] After carefully reviewing the parties' briefing, oral arguments, all matters of record, and the applicable legal authorities, the Court concludes that the United States has not waived sovereign immunity under the FTCA for Plaintiff's claims. As a result, the Court **grants** the Government's motion to dismiss this case under Federal Rule of Civil Procedure 12(b)(1). Plaintiff's claims are **dismissed** for lack of subject matter jurisdiction. The parties' cross-motions for summary judgment are **denied as moot.**

## I. BACKGROUND

---

[1]  Plaintiff filed a Response ("Plaintiff's Response") [Doc. # 30] in opposition to Defendant's Motion, to which Defendant filed a Reply ("Defendant's Reply") [Doc. # 31], and Plaintiff filed a Surreply ("Plaintiff's Surreply") [Doc. # 33]. Defendant filed a Response ("Defendant's Response") [Doc. # 32] in opposition to Plaintiff's Motion, to which Plaintiff filed a Reply ("Plaintiff's Reply") [Doc. # 34], and Defendant filed a Surreply ("Defendant's Surreply") [Doc. # 35]. On August 25, 2015, the Court heard oral arguments on the parties' motions.

A.     **Factual Background**

Plaintiff Tsolmon is a Mongolian citizen who at all times relevant to this case was residing in the United States on a valid visa.  This case stems from Tsolmon's arrest by Border Patrol agents of the United States Customs and Border Protection ("CBP") conducting a transportation check at approximately 9:30 p.m. on Friday, November 12, 2010, the CBP agents' failure to verify Tsolmon's immigration status after searching government databases for hours, and Tsolmon's subsequent detention at an immigration detention facility from approximately 3:00 a.m on Saturday, November 13, 2010, to approximately 8:40 p.m. on Sunday, November 14, 2010.  The following is a summary of Tsolmon's factual allegations and the undisputed facts established by the evidence of record.[2]

1.     **Tsolmon's Immigration History**

A complete explanation of Tsolmon's immigration history, which appears to span more than two decades and involves multiple visa adjustments, is not in the record.  Tsolmon testified only that his mother and several siblings legally reside in the United States.[3]  The parties agree Tsolmon first entered the United States on July 28, 1999, when he was approximately 16 years old.[4]  At that time, he had a valid F-2

---

[2]     Several of the allegations in Tsolmon's complaint are controverted by evidence in the record.  The Court is not bound to credit Tsolmon's allegations that are refuted by admissible and uncontroverted evidence.

[3]     Oral Deposition of Amarsaikhan Tsolmon ("Tsolmon Depo.") [Doc. # 29-3], at 6–7.  Both Plaintiff and Defendant attached as exhibits deposition testimony by Tsolmon and others.  For all deposition testimony in the record, the Court cites to the page number on the deposition transcript.  Further, to the extent there are duplicate copies of any exhibits in the record, the Court cites to only one copy for convenience.

[4]     *See* Declaration of Robert D. Wilson ("Wilson Decl.") [Doc. # 32-1], at ECF pages 68–72, ¶ 1.  Most of the specifics regarding Tsolmon's immigration history are
(continued...)

visa that he received as a dependent of his mother, who was a valid F-1 student visa holder.[5]  Tsolmon's visa apparently was adjusted to an F-1 student visa on May 13, 2002, once he started college in Lafayette, Louisiana.[6]  After he graduated college in 2008, Tsolmon's visa was adjusted a second time to an H-1B temporary worker visa.[7]  The evidence suggests Tsolmon's H-1B visa adjustment occurred on October 1, 2009 and was valid through September 20, 2012.[8]

### 2.    The Transportation Check

On Friday, November 12, 2010, Tsolmon traveled by bus from Houston, Texas, to Lake Charles, Louisiana.[9]  At approximately 9:30 p.m., in Lake Charles, Louisiana, CBP Agents Robert Wilson ("Agent Wilson") and Michael Lewandowski ("Agent Lewandowski") boarded Tsolmon's bus.[10]  This stop and search was part of a routine "transportation check" by CBP agents.[11]

Upon boarding the bus, Agents Wilson and Ledanowski began checking the

---

[4]     (...continued)
gleaned from a declaration submitted by the Government, some of which describes what Tsolmon purportedly told the Government officer during the events in issue, and which description Tsolmon does not dispute.

[5]     *Id.*

[6]     *See id.*; "Approval Notice for Tsolmon's Change from F-2 to F-1 Status," Exh. 1 to Plaintiff's Response [Doc. # 30-1].

[7]     Wilson Decl., ¶ 1.

[8]     *See* Email Copy of I-94 [Doc. # 29-5], at ECF page 7; *see also* Texas Identification Card, Exh. A to Amended Complaint [Doc. # 20-1], at ECF page 1 (stating that Tsolmon's "TEMPORARY VISITOR STATUS EXPIRES 09/20/2012").

[9]     *See* Tsolmon Depo., at 11.

[10]    Deposition of Robert D. Wilson ("Wilson Depo.") [Doc. # 29-1], at 41.

[11]    Wilson Decl., ¶ 1.

passengers' identification and asking non-citizens for immigration documents.[12] When Agent Wilson reached Tsolmon, Tsolmon gave him a copy of his Texas Identification Card, which states that he is a "TEMPORARY VISITOR."[13]  Agent Wilson then asked Tsolmon if he was a United States citizen, and Tsolmon stated that he was not but explained he had a valid H-1B temporary worker visa.[14]  Tsolmon admits that he was not carrying his immigration documents that night.[15]  Federal law requires a visa holder like Tsolmon to carry certain immigration documents at all times.[16]

Agent Wilson states that, while he was on the bus, he used the identifying information Tsolmon provided to contact the CBP "New Orleans dispatch" and to request a "records check."[17]  According to Agent Wilson, this search "yielded no

---

[12]   Wilson Depo., at 42; Tsolmon Depo., at 13–14.

[13]   Tsolmon Depo., at 14; Wilson Depo., at 42; Wilson Decl., ¶ 1.  *See also* Texas Identification Card, Exh. A to Amended Complaint [Doc. # 20-1], at ECF page 1.

[14]   Wilson Decl., ¶ 1; Tsolmon Depo., at 16, 18; Wilson Depo., at 42.  It is undisputed that Tsolmon admitted to not being a citizen at some point during the transportation check.  *See* Tsolmon Depo., at 16–17.

[15]   Tsolmon Depo., at 16, 18.

[16]   Under the Immigration and Nationality Act, "[e]very alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him pursuant to subsection (d) of this section.  Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than thirty days, or both."  8 U.S.C. § 1304(e).

[17]   Wilson Decl., ¶ 2.

validating information."[18]   Agent Wilson then asked Tsolmon to step off the bus and

escorted to him to a CBP vehicle nearby.[19]

While standing near the CBP vehicle by the side of the bus, Agent Wilson

allowed Tsolmon to call his roommate to try and locate proof of Tsolmon's valid H-

1B visa.[20]   Agent Wilson spoke to Tsolmon's roommate on the phone and obtained

certain identifying information from the documents.[21]   Tsolmon presents evidence

that, at approximately 10:00 p.m., his roommate emailed images to Tsolmon's cell

phone of Tsolmon's Mongolian passport and his most recent "I-94 card."[22]   Agent

---

[18]     *Id.*

[19]     Wilson Decl., ¶ 2; Tsolmon Depo., at 17.

[20]     Wilson Decl., ¶ 3; Tsolmon Depo., at 27.

[21]     *See* Wilson Depo., at 54; *see also* Tsolmon Depo., at 32.

[22]     *See* "Affidavit of Amar Tsolman [sic] Regarding E-mail From Roommate," Exh. F
to Plaintiff's Motion [Doc. # 29-5], at ECF pages 4–8.  Tsolmon states that an "1-94
card" comes "attached" to an H-1B visa "approval," and that the document depicted
on his phone indicated that he had a valid visa through September 2012.  Tsolmon
Depo., at 31.  The parties dispute the legibility of the documents on Tsolmon's cell
phone shown to Agent Wilson at the bus station.  Agent Wilson states the images
were "grainy and illegible," *see* Wilson Decl., ¶ 2; Wilson Depo., at 54, and that he
"couldn't read" any documents on Tsolmon's cell phone that night, *see* Wilson Depo.,
at 54; *see also id.*, at 47; Wilson Decl., ¶ 2.  Tsolmon testified during his deposition
on March 10, 2015, that he could not recall whether the images were "clear to read"
the night of the transportation check.  *See* Tsolmon Depo., at 32.  In an affidavit dated
April 27, 2015, however, Tsolmon changed his position and stated that he was able
to "clearly read" the documents and that his phone had a "large screen."  "Affidavit
of Amar Tsolmon Regarding Email Received On Friday November 12, 2010 at 9:59
PM" [Doc. # 29-5], at ECF page 5.  The Fifth Circuit requires an explanation when
the "the sole evidence purporting to create a genuine issue of material fact and thus
to preclude summary judgment is an affidavit that conflicts with deposition
testimony." *Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 (5th
Cir. 2002); *see also Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 318 (5th Cir.
(continued...)

Wilson also contacted the "U.S. Customs and Border Protection Radio in Orlando, Florida, to search several databases" and try to locate evidence of Tsolmon's valid H-1B visa.[23]   These searches, according to Agent Wilson, "came back negative for information."[24]   More specifically, he states that the searches of the Computer Linked Application Information Management System ("CLAIMS") and the "TECS Automated Targeting System-Passengers" ("ATS-P") revealed only that Tsolmon had arrived in July 1999 on an F-2 visa that had expired and that his appeal in 2001 to "extend or change his non-immigrant status" was denied.[25]   Agent Wilson explained that, at the bus station, "[a]ll the information that I had showed [Tsolmon] was an overstay.   I didn't have any other information proving otherwise."[26]   Having concluded that Tsolmon had failed to provide proof of his claimed valid H-1B visa,

---

[22]     (...continued)
1996) (a plaintiff's self-contradictory assertions insufficient to defeat summary judgment).  Tsolmon has given no explanation.  In any event, this dispute is not material to Tsolmon's claims or the outcome of this case.  *See* Plaintiff's Reply, at 3 n.2.

[23]     Wilson Decl., ¶ 2.

[24]     *Id.*

[25]     *Id.*  Tsolmon disputes that he was ever denied an application to extend or change his visa status.  He provides evidence that his application to adjust his visa from an F-2 to an F-1 visa was approved in May 2002.  "Approval Notice for Tsolmon's Change from F-2 to F-1 Status," Exh. 1 to Plaintiff's Response [Doc. # 30-1].  Whether Tsolmon ever had a visa application denied is not material at this time.

[26]     Wilson Depo., at 63.  Agent Wilson explained at his deposition that he believed Tsolmon's claims that he had a valid visa, but determined that he "can't release somebody off of belief alone" and that he needed to "have some type of proof," especially since "[w]e have a lot of people that are good liars."  *Id.*, at 64.  Agent Wilson further testified that "if there had been somebody able to come that night to bring [Tsolmon's] documents, his original documents, I would have stayed there until 5:00 in the morning for them to bring those documents to me."  *Id.*

Agent Wilson "place[d] him under arrest and transport[ed] him to the Lake Charles Border Protection Station to conduct further checks, and potentially process him for immigration proceedings as an F-2 visa 'overstay.'"[27]

### 3. Events at the CBP Station

At the station, Agent Wilson continued to search for evidence of Tsolmon's valid visa.[28]  Tsolmon states that he was sitting in a chair across from Agent Wilson for most of this time.[29]  Agent Wilson avers that he requested a second CLAIMS search from the "National Law Enforcement Communications Center (NLECC) in Orlando Florida" but that search "yielded no additional information."[30]  Agent Wilson further states that he "entered biographical and fingerprint information into IDENT/IAFIS (Automated Biometric Identification System/Integrated Automated Fingerprint Identification System) for immigration, criminal and outstanding warrants," and that "[n]o information returned."[31]

---

[27]     Wilson Decl., ¶ 3.

[28]     *See* Wilson Decl., ¶ 4; Tsolmon Depo., at 37–38.

[29]     Tsolmon Depo., at 37–38.  Tsolmon could not recall at his deposition if he was placed in a holding cell for any period of time when he arrived at the station on Friday.  *Id.*, at 38 ("I don't remember if it was–if they put me in holding cell or not [on Friday]. But I was across the officer for quite some time.").

[30]     Wilson Decl., ¶ 4.

[31]     *Id.*  Tsolmon's testimony is consistent.  Tsolmon recalls Agent Wilson "doing all kinds of entries on his computer" searching for Tsolmon's valid visa at the station. *See* Tsolmon Depo., at 36.  Tsolmon states that he does not recall whether he understood exactly what Agent Wilson was doing at the time, but he remembers Agent Wilson saying that he was entering his "information" for "records or something, something of that sort."  *Id.*  Tsolmon further states another agent was "coming up [to the desk], [with] printed papers of different searches I believe."  *Id.*, at 37.  He recalls seeing "one search" with his "name," "something about criminal (continued...)

At about 11:50 p.m., Agent Lewandowski called CBP supervisor Agent Daniel Stanley ("Agent Stanley") at home.[32]   Agent Stanley suggested running the searches again and calling a family member or friend of Tsolmon to continue to try and verify his immigration status.[33]   Tsolmon was allowed to call his mother, who orally confirmed his legal immigration status to Agent Wilson but was unable to provide written documentation.[34]   Agent Wilson states that "repeat checks came back with no new information beyond [Tsolmon's original] F-2 status," which had expired.[35]

Tsolmon disputes that Agent Wilson's searches did not reveal evidence of any visa adjustments after his F-2 visa expired.  Tsolmon further argues that the agents should have been able to locate evidence of his valid visa from the information Tsolmon provided.  But Tsolmon does not argue that the database searches conducted Friday night and early Saturday morning showed evidence of his claimed visa adjustment in 2009 from an F-1 student visa to his H-1B temporary worker visa.[36]

---

[31]   (...continued)
records," and giving the agents his social security number.  *Id.*

[32]   *See* Wilson Decl., ¶ 5; Wilson Depo., at 82–83.

[33]   *Id.*

[34]   Wilson Depo., at 67–68.  Tsolmon's deposition testimony suggests that he may have been allowed to call his mother from the station earlier.  He states that "a lot of phone calls were made from me to my mom" at the station, Tsolmon Depo., at 34, and describes talking to her while Agent Wilson was entering data into the computer, *id.*, at 35–36.  Any uncertainty regarding when Tsolmon called his mother is not a genuine and material fact dispute.

[35]   Wilson Decl., ¶ 5.  More specifically, Agent Wilson testified at his deposition that he was unable to find evidence of Tsolmon's F-1 visa, his "EADS card," or his claimed valid H-1B visa.  Wilson Depo., at 69.

[36]   Specifically, Tsolmon points to evidence that a CLAIMS database search conducted
(continued...)

### 4.       Tsolmon Charged and Arrested

After approximately three hours at the station, Agent Wilson decided to process Tsolmon as a "non-immigrant overstay" because Tsolmon did not have with him, and Agent Wilson could not find electronically, immigration documents establishing current authority for Tsolmon's presence in the United States.[37]   Agent Wilson states he decided to charge Tsolmon because he "didn't have any proof of [Tsolmon] being here in the United States legally," and "[b]ecause [Agent Wilson] didn't have anything to substantiate [Tsolmon's] release."[38]   As a result, Agent Wilson prepared a "Notice to Appear" ("NTA") and other documents charging Tsolmon with being a non-citizen in the United States in violation of the terms of his F-2 visa.[39]

---

[36]       (...continued)
at 1:35 a.m. on Saturday, November 13, 2010, states "APPROVAL NOTICE SENT," an apparent reference to Tsolmon's 2002 visa adjustment from an F-2 to an F-1 visa when he became a college student.  "All Database Queries Made Friday 11/12/10 and Early Saturday," Exh. J to Plaintiff's Motion [Doc. # 29-5], at ECF page 42.  Tsolmon also points to the results of another search result conducted at 10:47 p.m. on Friday, November 12, 2012, stating "I-94 NUMBER MUST BE 11 DIGITS" as evidence that the CBP agents made errors in their search for Tsolmon's valid visa.  *See id.*, at ECF page 32.

Also, the Government contends that Tsolmon had an "early I-94," which misled the agents during their computer searches.  *See, e.g.*, Defendant's Reply, at 4.  Tsolmon disputes that he had more than one I-94 number.  *E.g.*, Plaintiff's Surreply, at 1-2.  For present purposes, the Court construes the evidence in the light most favorable to Tsolmon.

[37]       Wilson Decl., ¶ 5; *see also* Wilson Depo., at 69–71, 93.

[38]       Wilson Depo., at 70.

[39]       *See* "Notice to Appear," Exh. L to Plaintiff's Motion [Doc. # 29-5], at ECF pages 50–51.  The record shows that the NTA was accompanied by a "Warrant for Arrest of Alien" stating Tsolmon was being taken into custody for violations of United States immigration laws.  *See* Exh. G to Plaintiff's Motion [Doc. # 29-5], at ECF page 10.
(continued...)

At approximately 2:30 a.m. on Saturday, November 13, 2010, Agent Wilson transported Tsolmon to the Southwest Louisiana Correctional Center ("SLCC").[40] Tsolmon was held at SLCC for approximately forty hours, until Sunday evening.

Tsolmon complains that the conditions at SLCC were horrible, but he does not argue Agents Wilson or Stanley had control over or caused those conditions.[41] Tsolmon does not dispute that SLCC is "a detention center run by LCS Corrections

---

[39]     (...continued)
There also was a Notice of Custody Determination stating that Tsolmon was to be released under bond in the amount of $5,000. *See* Exh. D-2 to Wilson's Depo. [Doc. # 29-1], at ECF page 127. Tsolmon alleges that Agent Wilson informed him that he would be given the opportunity to request his release and pay the bond by appearing before an immigration judge on Monday. Amended Complaint [Doc. # 20], ¶ 44.

There is conflict in the record regarding the circumstances surrounding the preparation and delivery of these documents, containing the printed date November 12, 2010 (Friday), and a handwritten date "11-13-10" under the signature on the Notice of Custody Determination. Agent Wilson explains this was a clerical anomaly because he printed the documents right before midnight on Friday, November 12, 2010, and signed the document shortly after midnight on Saturday, November 13, 2010. Wilson Depo., at 78–79. Tsolmon complains that Agent Stanley refused to give him copies of the documents when Tsolmon was eventually released from SLCC on Sunday night. Tsolmon's Depo., at 57.

[40]     *See* Wilson Decl., ¶ 5; Tsolmon Depo., at 38.

[41]     Tsolmon states that, at SLCC, he was initially placed in a temporary holding cell because the facility did not have a "room assigned for him." Tsolmon Depo., at 40. He was moved to a different cell sometime on Saturday "could be evening" that held 30-40 detainees. Tsolmon Depo., at 40–41. He states that the entire detention center was dark, disorienting, and that he was unable to sleep well. *Id.*, at 41–42. He further states that he was not given any food on Saturday. *Id.*, at 41. He asked for water and was told there was none. *Id.* Instead, he describes how the thirty or so inmates had two cups, a bucket of ice, and a microwave in the cell, and that, when Tsolmon stated he was thirsty, he was only offered the chance to use one of the shared cups to melt ice in the microwave in the cell. *Id.*, at 43–44. He also states that he complained three times about his contact lenses hurting his eyes, and the only response he received was that his request had been sent to the nurse. *Id.*, at 44.

Services, a private contractor of U.S. Immigrations and Customs Enforcement (ICE). The U.S. Border Patrol [CBP] has *nothing* to do with the running of the detention facility, and is not responsible for conditions of confinement."[42]

### 5.    Tsolmon's Valid Immigration Status Verified

On Sunday, November 14, 2010, at approximately 3:30 p.m., CBP supervisor, Agent Stanley, returned to the station to work the evening shift.[43]  He decided to conduct his own review of Tsolmon's file and searched for evidence of Tsolmon's valid visa.[44]  He re-did many of the searches conducted late Friday night.[45]  After what he says was several hours of searching, Agent Stanley eventually located Tsolmon's H-1B visa by finding an approved Petition for Nonimmigrant Worker (Form I-129) filed by Tsolmon's employer, ContentActive, L.L.C., showing that USCIS had granted

---

[42]    Declaration of Daniel G. Stanley dated April 14, 2015 ("Stanley April 2015 Decl.") [Doc. # 28-1], at ECF pages 65-67, ¶ 4 (emphasis in original).  Similarly, Agent Stanley testified at his deposition that, "[f]rom the Border Patrol standpoint, once we book them in and turn the, you know, the Intake Officer signs off on the 216 [form] and the 203 [form] and they have their property, they have taken custody of them.  I have no control over what happens after that.  The Border Patrol doesn't run the facility." Deposition of Daniel Stanley ("Stanley Depo.") [Doc. # 29-2], at 36.  Agent Stanley clarified elsewhere in his deposition that the I-216 and I-203 forms are used to book detainees into detention facilities.  *Id.*, at 38.

[43]    Stanley Depo., at 37.

[44]    *Id.*, at 41; Declaration of Daniel G. Stanley dated February 11, 2014 ("Stanley Feb. 2014 Decl.") [Doc. # 28-1], at ECF pages 73-75, ¶ 2.  Agent Stanley testified that his decision to conduct his own search on Sunday was motivated by Agent Wilson's statements that he believed Tsolmon to be "sincere" in his claim to a valid visa.  Stanley Depo., at 41, 43.  The record also contains evidence of records searches that were apparently conducted on Saturday, November 13, 2010, in the afternoon.  *See* "All Database Queries Made Saturday Afternoon 11/13/2010," Exh. K to Plaintiff's Motion [Doc. # 29-5], at ECF pages 43–48.

[45]    Stanley Depo., at 41.

Tsolmon an H-1B visa effective from October 1, 2009 to September 20, 2012.[46]  He found the I-129 using the identifying information Tsolmon's roommate had provided to Agent Wilson over the phone on Friday night.[47]

Once Agent Stanley verified Tsolmon's immigration status, he notified Agent Wilson who drove to SLCC and picked up Tsolmon.[48]  Meanwhile, that same day, Tsolmon's brother obtained Tsolmon's original immigration documents from Tsolmon's home in Houston, Texas, and drove them to Lake Charles, Louisiana.[49] Tsolmon's brother arrived at the CBP station Sunday evening and presented Tsolmon's immigration documents to the CBP agents.[50] Tsolmon left the station with his brother at approximately 8:40 p.m. on Sunday, November 14, 2010.[51]

### B.   Procedural History

On or about August 22, 2012, Tsolmon filed an administrative tort claim with CBP,  alleging that the events in November 2010 deprived him of his Fourth Amendment rights and constituted false imprisonment, false arrest, and negligent infliction of emotional distress.[52]  In a letter dated May 20, 2013, CBP denied

---

[46]   Stanley April 2015 Decl., ¶ 2.

[47]   *Id.*; Stanley Depo., at 43.  Tsolmon contends that Agents Wilson and Lewandowski erred on Friday night by not asking Tsolmon for his employer's name and not conducting a database search using this information.

[48]   Stanley Depo., at 51–52; Wilson Decl., ¶ 7.  There are no allegations that CBP delayed releasing Tsolmon after Agent Stanley verified Tsolmon's immigration status.

[49]   Tsolmon Depo., at 52–53.

[50]   *See* Stanley April 2015 Decl., ¶ 6; Tsolmon Depo., at 53.

[51]   Stanley April 2015 Decl., ¶ 8; *see also* Tsolmon Depo., at 57.

[52]   Claim for Damage, Injury, or Death ("Administrative Complaint") [Doc. # 33-1].  On
(continued...)

Tsolmon's administrative claim because the evidence failed to "establish negligence, wrongful acts, or omissions on the part of agency employees" and "the alleged personal damages are unsubstantiated by competent evidence."[53]

On November 20, 2013, Tsolmon filed this federal suit against Agent Wilson, Agent Stanley, and the United States.[54]  In his Amended Complaint [Doc. # 20], Tsolmon asserts two causes of action against the United States under the Federal Tort Claims Act ("FTCA") and dropped his claims against the CBP agents.[55]  Count I of the Amended Complaint advances a claim for the Louisiana tort of false imprisonment and false arrest, alleging that the "forty-eight hour arrest, detention and imprisonment of Mr. Tsolmon by CBP Agents Wilson and Stanley was unlawful because it was done without a warrant and without probable cause of alleged violations of federal civil immigration laws, in a manner preempted by the Fourth Amendment to the Constitution of the United States, and without statutory authority under 8 U.S.C. § 1357(a)(2)."[56]  Count II is a claim under Louisiana law for negligence regarding the investigation of Tsolmon's immigration status and alleges that Agent Wilson breached

---

[52]    (...continued)
         August 27, 2012, CBP sent a letter instructing Tsolmon to submit evidence in support
         of his claims and substantiating his alleged injuries.  Declaration of Pamela A. Miller
         ("Miller Decl.") [Doc. # 28-1], at ECF pages 76–77, ¶ 3.  CBP states, and Tsolmon
         does not dispute, that Tsolmon never sent evidence in response to this letter.  *Id.*, ¶ 4.

[53]    Letter dated May 20, 2013 ("CBP Denial Letter") [Doc. # 28-1 at ECF page 78]; *see
         also* Miller Decl., ¶ 5.

[54]    Complaint and Demand for Jury Trial ("Original Complaint") [Doc. # 1].

[55]    Tsolmon's Amended Complaint eliminated his constitutional tort claims against
         Agents Wilson and Stanley under *Bivens v. Six Unknown Federal Narcotics Agents*,
         403 U.S. 388 (1971).

[56]    Amended Complaint [Doc. # 20], ¶ 85.

his "duty of care in the performance of his job to ensure that members of the public are not impermissibly arrested and detained" when he arrested Tsolmon without a warrant and without probable cause.[57]   Tsolmon in this claim further alleges that Agents Wilson and Stanley were "negligent in not verifying Plaintiff's immigration status for almost two days despite having the necessary information to do so."[58] Tsolmon seeks monetary damages, costs, and attorneys' fees.[59]

The United States moves to dismiss this case under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  The United States contends it has not waived sovereign immunity under the FTCA for either of Plaintiff's claims. Defendant further asserts that Plaintiff's negligence claim is time barred.   In the alternative, Defendant moves for summary judgment on all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 56.   Plaintiff Tsolmon filed a cross-motion for summary judgment seeking judgment as a matter of law against Defendant on all of his claims.  The Court addresses the parties' jurisdictional arguments, which resolve the case.  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

## II.   APPLICABLE LEGAL STANDARD

Sovereign immunity is jurisdictional in nature.  *F.D.I.C. v. Meyer*, 510 U.S. 471, 474 (1994).  "The question of whether the United States has waived sovereign immunity pursuant to the FTCA goes to the court's subject-matter jurisdiction . . . and may therefore be resolved on a Rule 12(b)(1) motion to dismiss."  *Willoughby v. U.S. ex rel U.S. Dep't of the Army*, 730 F.3d 476, 479 (5th Cir. 2013) (internal citations

---

[57]   *Id.*, ¶ 90.

[58]   *Id.*

[59]   *Id.*, at 12.

omitted).[60]

Pursuant to Federal Rule of Civil Procedure 12(b)(1), "'[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.'"  *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014) (quoting *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005)).  When there is a challenge to the court's subject matter jurisdiction, the

---

[60]    The parties do not dispute that Rule 12(b)(1) governs the Court's determination of the jurisdictional issues presented in this case.  The Fifth Circuit has held that, in certain circumstances, "a jurisdictional attack intertwined with the merits of an FTCA claim should be treated like any other intertwined attack, thereby making resolution of the jurisdictional issue on a 12(b)(1) motion improper."  *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004).  *But see Hous. Refining, L.P. v. United Steel, Paper & Forestry, Rubber Mfg.*, 765 F.3d 396, 407 n.20 (5th Cir. 2014) ("Although we need not pass on this question today, we express doubt about whether a court can ever 'assume jurisdiction and proceed to the merits,' *Montez*, 392 F.3d at 150, in light of the Supreme Court's rejection of such 'hypothetical jurisdiction,' [*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)].  We reserve for a future case a fuller consideration of the correctness of *Montez*.").  In the motions at bar, the Government contends that Plaintiff's claims fall within the exception to the FTCA's waiver of sovereign immunity for discretionary conduct in 28 U.S.C. § 2680(a).  The merits of Plaintiff's underlying claims are not dispositive of the issues presented regarding the scope of FTCA's waiver of sovereign immunity, and the Court resolves the jurisdictional issues using a pure Rule 12(b)(1) approach.  *See, e.g.*, *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012); *see also Hix v. U.S. Army Corps. Eng'rs*, 155 F. App'x 121, 128 (5th Cir. 2005) ("[B]ecause the discretionary function exception [in 28 U.S.C. § 2680(a)] 'is premised on the notion that there is no jurisdiction to hear the claim as the United States has not waived sovereign immunity for that kind of suit, such defenses should be raised by a motion to dismiss for lack of subject matter jurisdiction rather than by a motion for summary judgment.'" (quoting *Stanley v. Cent. Intelligence Agency*, 639 F.2d 1146, 1157 (5th Cir. 1981))); *Walding v. United States*, Civ. Action No. SA-08-CA-124-XR, 2009 WL 902423, at *4 (W.D. Tex. Mar. 31, 2009) ("The Court finds that the facts relating to the jurisdictional issue of the application of the discretionary function exception are not intertwined with the merits, and the jurisdictional issue can be resolved separately.").

party asserting jurisdiction bears the burden of establishing jurisdiction exists. *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 487 (5th Cir. 2014); *Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014).  "A motion to dismiss for lack of subject-matter jurisdiction should only be granted if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d at 286.  "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161.[61]

In deciding the pending motions, the Court considers the well-pleaded factual allegations in the Amended Complaint, the undisputed factual evidence in the record, as well as material disputed evidence, which is viewed in the light most favorable to

---

[61]     Federal courts sometimes describe a difference between "facial" and "factual" attacks under Rule 12(b)(1).  *See, e.g.*, *Patty v. United States*, Civ. Action No. H-13-3173, 2015 WL 1893584, at *3 (S.D. Tex. Apr. 27, 2015) (Rosenthal, J.); *Engenium Solutions, Inc. v. Carr*, Civ. Action No. H-10-4412, 2012 WL 8432678, at *6 (S.D. Tex. Sept. 28, 2012) (Ellison, J.).  "A facial attack, which consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence, challenges the court's jurisdiction based solely on the pleadings."  *Russell v. City of Hous.*, 808 F. Supp. 2d 969, 972 (S.D. Tex. 2011) (Werlein, J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)).  "When presented with a facial challenge to subject matter jurisdiction, the court examines whether the allegations in the pleadings, which are assumed to be true, are sufficient to invoke the court's subject matter jurisdiction."  *Id.* (citing *Paterson*, 644 F.2d at 523).  On the other hand, "[a]n attack is 'factual' rather than 'facial' if the defendant 'submits affidavits, testimony, or other evidentiary materials.'"  *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (quoting *Paterson*, 644 F.2d at 523).  "When a defendant makes a 'factual' attack on a court's subject-matter jurisdiction, the court is 'free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'"  *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 223 (5th Cir. 2012) (quoting *Morris v. U.S. Dep't of Justice*, 540 F. Supp. 898, 900 (S.D. Tex. 1982)).

the Plaintiff.  The Court does not resolve any disputed issues of fact.

## III.   ANALYSIS

### A.   Overview of the FTCA

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *Meyer*, 510 U.S. at 474.  "Courts strictly construe waivers of sovereign immunity and resolve all ambiguities in favor of the sovereign."  *Huff v. Neal*, 555 F. App'x 289, 297 (5th Cir. 2014) (citing *Lane v. Pena*, 518 U.S. 187, 192 (1996)).[62]  Additionally, "a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text."  *Cooper*, 132 S. Ct. at 1448 (citations omitted).  "Legislative history cannot supply a waiver that is not clearly evident from the language of the statute."  *Id.*  "[P]laintiffs bear the burden of showing Congress's unequivocal waiver of sovereign immunity."  *Spotts*, 613 F.3d at 568 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

"The FTCA is a waiver of sovereign immunity that allows a plaintiff to bring a civil action for damages against the Government."  *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009).  "Plaintiffs may recover against the United States and its agencies under the FTCA 'in the same manner and to the same extent as a private individual under like circumstances' under substantive state law."  *Pleasant v. U.S. ex rel. Overton Brooks Veterans Admin. Hosp.*, 764 F.3d 445, 448 (5th Cir. 2014) (quoting 28 U.S.C. § 2674).  Under the FTCA, federal district courts have "exclusive

---

[62]     "Any ambiguities in the statutory language are to be construed in favor of immunity . . . so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires."  *F.A.A. v. Cooper*, 132 S. Ct. 1441, 1448 (2012) (internal citation omitted); *see also Jeanmarie v. United States*, 242 F.3d 600, 604 (5th Cir. 2001) ("Statutes waiving sovereign immunity of the United States are to be 'construed strictly in favor of the sovereign.'") (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951)).

jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *accord Spotts*, 613 F.3d at 565.

The FTCA creates several time limitations for a plaintiff to bring a cause of action.[63]  The Government contends that Tsolmon's negligence claim is time barred due to Tsolmon's failure to assert his negligence claim earlier.[64]  The Government's argument that exhausting administrative remedies is a prerequisite to jurisdiction under the FTCA is unfounded.  The United States Supreme Court recently held that the "the FTCA's time bars are nonjurisdictional."  *Kwai Fun Wong*, 135 S. Ct. at 1638.[65]  The Court, therefore, first addresses the parties' jurisdictional arguments

---

[63]  Under the FTCA, "a tort claim against the United States 'shall be forever barred' unless it is presented to the 'appropriate Federal agency within two years after such claim accrues' and then brought to federal court 'within six months' after the agency acts on the claim."  *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1629 (2015) (quoting 28 U.S.C. § 2401(b)).

[64]  Defendant's Motion, at 18.  The timeliness of Plaintiff's false arrest and false imprisonment claims is not at issue. It is undisputed that (1) Plaintiff timely filed an administrative claim with the appropriate federal agency, CBP, on August 22, 2012; (2) Plaintiff's administrative claim was denied by CBP on May 20, 2013; and (3) Plaintiff timely filed his complaint in federal court on November 20, 2013, the day the six month deadline expired.  While Plaintiff asserted his false arrest and false imprisonment claims throughout this process, Plaintiff added his negligence claim for the first time in his Amended Complaint filed on March 21, 2014, well after the expiration of the FTCA deadlines.

[65]  In *Kwai Fun Wong*, the Supreme Court resolved a circuit split, held that the FTCA's
(continued...)

regarding the scope of the FTCA's waiver of sovereign immunity.[66]

"Congress has carved out several exceptions to the FTCA's broad waiver of immunity." *Davila v. United States*, 713 F.3d 248, 263 (5th Cir. 2013). At issue in

---

[65]   (...continued)
time limits are nonjurisdictional and thus are subject to equitable tolling, and in doing so abrogated the Fifth Circuit's prior decisions to the contrary. *See Kwai Fun Wong*, 135 S. Ct. at 1631, 1638.

[66]   Because the Court concludes below that the United States has not waived sovereign immunity for Plaintiff's claims in this case, the Court does not reach the merits of this time-bar issue. It is noted, however, that Tsolmon appears to have satisfied the FTCA's filing requirements for his negligence claim. The Fifth Circuit has recognized that the underlying purposes of the FTCA's two-year deadline for presenting a claim to the appropriate federal agency and receiving a final written denial before filing in federal court "'will be served as long as a claim brings to the Government's attention facts sufficient to enable it thoroughly to investigate its potential liability and to conduct settlement negotiations with the claimant.'" *Pleasant*, 764 F.3d at 449 (quoting *Rise v. United States*, 630 F.2d 1068, 1071 (5th Cir. 1980)). Tsolmon satisfied the notice-of-claim requirements by timely filing a factually detailed administrative complaint claiming false imprisonment, false arrest, and negligent infliction of emotional distress, thus giving CBP "written notice of his or her claim sufficient to enable the agency to investigate" and placing a value on his claim. *See id.*

Additionally, in federal court, an amendment to a pleading "relates back to the date of the original pleading" when the law providing the applicable statute of limitations allows relation back, the amendment and "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(c)(1). "'[Once litigation involving a particular transaction has been instituted, the parties should not be protected [by the statute of limitations] from later asserted claims that arose out of the same conduct set forth in the original pleadings.'" *Flores v. Cameron Cnty., Tex.*, 92 F.3d 258, 272 (5th Cir. 1996) (quoting *Kansa Reinsurance Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366–67 (5th Cir. 1994)) (second alteration in original). The Fifth Circuit has recognized that tort claims asserted under the FTCA may relate back to the original complaint. *See, e.g.*, *McGuire v. Turnbo*, 137 F.3d 321, 325–26 (5th Cir. 1998); *Edwards v. United States*, 755 F.2d 1155, 1158 (5th Cir. 1985); *Williams v. United States*, 405 F.2d 234, 239 (5th Cir. 1968).

this case is the exception for federal employees' discretionary conduct, 28 U.S.C. § 2680(a), and the exception for certain claims arising out of enumerated torts other than claims involving certain conduct by law enforcement officers, 28 U.S.C. § 2680(h).  For the reasons explained below, the Court concludes that Tsolmon's causes of action are barred by the discretionary function exception of § 2680(a) to the FTCA's waiver of sovereign immunity and that the FTCA's waiver of sovereign immunity through the law enforcement proviso of § 2680(h) does not extend to the claims in this case.  Tsolmon thus has not met his burden to establish that the United States waived sovereign immunity for his claims, and the Court lacks subject matter jurisdiction.[67]

### B.   Discretionary Function Exception to the FTCA's Waiver of Sovereign Immunity

#### 1.   Applicable Legal Standard

A provision courts refer to as the "discretionary function exception" limits the FTCA's waiver of sovereign immunity.  The waiver does not extend to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a); *accord Spotts*, 613 F.3d at 566–67.  In the Fifth Circuit, on a motion to dismiss, "a plaintiff has the burden of stating a claim for a state-law tort and establishing that the discretionary function exception does not apply."  *Spotts*, 613 F.3d at 569 (citing *St. Tammany Parish v. Fed. Emergency Mgmt. Agency*, 556 F.3d

---

[67]   The Court does not decide the parties' summary judgment motions.

307, 315 n.3 (5th Cir. 2009)).  Plaintiff Tsolmon, therefore, must "advance a claim that is facially outside the discretionary function exception in order to survive the motion to dismiss."  *St. Tammany Parish*, 556 F.3d at 315 n.3; *accord Huff*, 555 F. App'x at 297.

The Fifth Circuit has not yet decided if the plaintiff or the Government bears the ultimate burden of proof to show whether the discretionary function exception to the waiver of sovereign immunity applies.  *See St. Tammany Parish*, 556 F.3d at 315 n.3; *Walding v. United States*, 955 F. Supp. 2d 759, 770 (W.D. Tex. 2013).  Other circuits are split on this issue.  *Compare Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998) (placing the burden on the plaintiff to prove that the exception does not apply), *with S.R.P. v. United States*, 676 F.3d 329, 333 n.2 (3d Cir. 2012) (collecting cases and explaining that the Third, Sixth, Seventh, and Ninth Circuits have all held that the burden is on the Government to prove the exception applies).  The Court will assume without deciding that the Government bears this burden of proof.

An act falls within the discretionary exception function if: (1) the challenged act involves an "element of judgment" and (2) the judgment is "of the kind the exception was designed to shield."  *Davila*, 713 F.3d at 263 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991); *Ashford v. United States*, 511 F.3d 501, 505 (5th Cir. 2007)) (internal quotation marks omitted).  Both prongs of this two part test must be satisfied in order for the discretionary function exception to apply.  *Id.*  With regard to the first prong of the analysis, "the conduct must be a 'matter of choice for the acting employee.'"  *Spotts*, 613 F.3d at 567 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  The "nature of the conduct," not the "status of the actor" governs whether the exception applies.  *Id.*  Under the second prong, "'the proper inquiry . . . is not whether [the government actor] in fact engaged in a policy analysis

when reaching his decision but instead whether his decision was 'susceptible to policy analysis.'" *Davila*, 713 F.3d at 263 (quoting *Spotts*, 613 F.3d at 572).

> ### 2.   Prong 1: Whether Agents Wilson and Stanley's Challenged Conduct Involved an Element of Judgment or Choice

***Identification of the Challenged Conduct.***— A threshold issue in the first prong of the analysis for the discretionary function exception is to determine precisely what conduct is challenged in Plaintiff's negligence and false arrest/false imprisonment claims. Tsolmon alleges in his Amended Complaint that Agent Wilson acted negligently by "arresting Plaintiff without a warrant and without probabl[e] cause, for alleged violations of federal civil immigration laws." Amended Complaint, ¶ 90. Tsolmon further alleges that Agents Wilson and Stanley were "negligent in not verifying Plaintiff's immigration status for almost two days despite having the necessary information to do so." *Id.* In his false arrest/false imprisonment claim, Tsolmon alleges that Agents Wilson and Stanley committed tortious conduct by "order[ing] Plaintiff off the bus in which he was traveling, transport[ing] him to a CBP office, interrogat[ing] him[,] and transport[ing] to, and plac[ing] him in, jail." *Id.*, ¶ 83. Tsolmon also alleges in his false arrest/false imprisonment claim that his arrest, detention, and imprisonment were "unlawful" because they were done "without a warrant and without probable cause for alleged violations of federal civil immigration laws in a manner preempted by the Fourth Amendment to the Constitution of the United States and without statutory authority under 8 U.S.C. § 1357(a)(2)." *Id.*, ¶ 85.

Notwithstanding these broad allegations, Tsolmon's briefing on the pending motions and his counsel's comments at oral argument narrow the challenged conduct at issue. Tsolmon states that he "does not object to the actions and conduct of Defendant's Customs and Border Protection agents in questioning him about his

immigration status on the bus, at the bus station and at the CBP office in Lake Charles, Louisiana" and that he sees "no violation in these necessary law enforcement activities. *E.g.*, Plaintiff's Motion, at 7. Tsolmon instead describes the challenged conduct in this case as "CBP's failure to verify his immigration status," which "amounted to negligence," and "the decision to incarcerate [Tsolmon] in a detention center," which "amounted to false imprisonment." *Id.*[68]

Tsolmon also contends that his claims challenge a CBP policy in effect in 2010 requiring agents to detain (either with or without a $5,000 cash bond depending on an individual's criminal history) anyone charged with being illegally present in the United States once a Notice to Appear ("NTA") was issued.[69] Tsolmon did not

---

[68]   Tsolmon also asserts in his briefing and at oral argument that his claims challenge CBP's putative failure to train agents and failure to provide adequate computer equipment. Neither of these theories are properly before the Court. Tsolmon did not allege in his federal Complaints that CBP failed to train agents or provided inadequate equipment. Further, even if such a claim were properly before the Court, Tsolmon, as explained below, fails to establish that this conduct falls outside the discretionary function exception.

Tsolmon's summary judgment briefing further argues Agents Wilson and Stanley's breached their "duty to ensure Tsolmon's health and well being while in detention" "by placing him in a facility where conditions were deplorable." Plaintiff's Motion, at 24–25. At oral argument, Plaintiff's counsel clarified that the allegations regarding the deplorable conditions at SLCC are relevant to potential damages suffered, not a separate claim of Agents Wilson and Stanley's alleged misconduct. Indeed, Agent Stanley testified—without contradiction in the record—that he and Agent Wilson had no control over the conditions at SLCC. Moreover, any claim concerning inadequate prison conditions at SLCC is not properly before the Court, as Tsolmon's Complaint does not allege that Agents Wilson and Stanley breached any duty to ensure his well being at SLCC.

[69]   Agent Wilson testified that "[a]t that time we were detaining everybody that we NTA'd. Depending on their criminal history, they would have a $5000 cash bond that they would be able to pay for their release and for their future court dates." Wilson Depo., at 74. The Government further acknowledges in its interrogatory answers that
(continued...)

administratively exhaust or plead a claim associated with this policy in his Complaints.  In any event, close review establishes that this policy is not in fact the complained of misconduct by the agents in this case.   Construing Tsolmon's allegations broadly, he contends repeatedly that the CBP agents had all necessary information about him (such as his name, alien identification number, birth date, and employer's name) to verify his legal immigration status on Friday night, but did not release him because they erroneously and incompetently failed to correctly collect or interpret the electronically available data that showed he had a valid H-1B visa. Tsolmon thus challenges the conclusions the CBP agents' drew from their investigation of Tsolmon's immigration status and the basis and timing of Agent Wilson's decision to issue an NTA charging Tsolmon with being an alien illegally present in the United States, which NTA resulted in Tsolmon's arrest and two-day incarceration.[70]   The Court next turns to whether this challenged conduct was discretionary.

  ***Whether the Challenged Conduct Was Discretionary.***— It is well established that "decisions on when, where, and how to investigate and whether to prosecute" are

---

[69] (...continued)
"[d]uring the period relevant to this case . . . ICE/ERO detained all aliens that were believed to be in the United States illegally and were apprehended by the United States border patrol.   Bonds of $5000 were required for WA [Warrant for Arrest]/NTA."  Defendant's Answers to Interrogatories, Exh. D to Plaintiff's Motion [Doc. # 29-4], at 11.

[70] *See also Hodgson v. United States*, Civ. Action No. SA:13-CV-702, 2014 WL 4161777, at *12 & n.5 (W.D. Tex. Aug. 19, 2014) (holding that the challenged conduct fell within the discretionary function exception because, even though the plaintiff's detention was "mandatory once ICE officers initiated an investigation against him because of his criminal history," "[i]t was the ICE officers' decision to investigate Plaintiff that led to his custody and continued detention," and thus the decision to investigate plaintiff was the decision actually at issue").

considered discretionary conduct. *Sutton v. United States*, 819 F.2d 1289, 1295 (5th Cir. 1987).[71] Of particular relevance here, the Fifth Circuit has specifically recognized that an agent's decisions during the investigation of a plaintiff's immigration status are discretionary. *Nguyen v. United States*, 65 F. App'x 509, 2003 WL 1922969, at *1 (5th Cir. Mar. 31, 2003) (per curiam) ("Decisions to investigate, how to investigate and whether to prosecute generally fall within this [discretionary function] exception.").[72] Thus, the CBP agents' conduct during their investigation of Tsolmon's immigration status, the conclusions drawn from their investigation, and the decision to issue the NTA, are generally considered discretionary conduct.

---

[71]   *See also, e.g.*, *Smith v. United States*, 375 F.2d 243, 247–48 (5th Cir. 1967) ("The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute."); *Mesa v. United States*, 123 F.3d 1435, 1438 (11th Cir. 1997) ("We readily conclude that the decisions regarding how to locate and identify the subject of an arrest warrant and regarding whether the person apprehended is in fact the person named in the warrant are discretionary in nature and involve an element of judgment or choice."); *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) (finding that federal agents acted with discretion when assigned to collect evidence and conduct investigations); *McElroy v. United States*, 861 F. Supp. 585, 591 (W.D. Tex. 1994) ("In general, because it is the mandatory duty of law enforcement agents to enforce the law, decisions as to how to best fulfill that duty are protected by the discretionary function exception.").

[72]   *See also Hodgson*, 2014 WL 4161777, at *11 ("What Plaintiff is essentially challenging is the ICE officers's decisions regarding how to investigate Plaintiff's case.   This action falls squarely within the discretionary function exception."); *Medina*, 259 F.3d at 226–27 n.4 (noting that a malicious prosecution claim against the United States based on "the decision to issue the NTA would also be excepted from the FTCA waiver of sovereign immunity as a discretionary function"); *Douglas v. United States*, 796 F. Supp. 2d 1354, 1369 (M.D. Fa. 2011) ("[Plaintiff's] allegations that ICE agents negligently failed to ascertain or verify his citizenship status fall squarely within the discretionary function exception."); *Timmerman v. United States*, Civ. Action No. 11-1616 (JAG), 2012 WL 2052149, at *3 (D.P.R. June 5, 2012) ("[Plaintiff's] claims that ICE agents negligently investigated his case and handled evidence are barred by the discretionary function exception.").

*Alleged Statutory Violation.*— Tsolmon argues that the CBP agents' conduct falls outside the discretionary function exception because the agents violated a specific statute governing such decisions, 8 U.S.C. § 1357(a)(2).  Plaintiff's Surreply, at 8; Plaintiff's Reply, at 8.  This argument is unavailing.  It is true that the discretionary function exception does not apply if the government official's conduct was governed by a "statute, regulation or policy giving *specific* direction as to any of these functions in a way that would make [the acts] non-discretionary."  *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005) (citing *Gaubert*, 499 U.S. at 321) (emphasis added).  On the other hand, "[i]f a statute, regulation, or policy leaves it to a federal agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary."  *Spotts*, 613 F.3d at 567 (citing *Gabuert*, 499 U.S. at 329); *see also Freeman v. United States*, 556 F. 3d 326, 339 (5th Cir. 2009) (holding that responsibilities outlined in an agency's documents "were so general that they too fail to prescribe a nondiscretionary course of action" because "[a]lmost by definition these 'responsibilities' required the agency to exercise judgment and choice to define specific directives or functions").

Pursuant to § 1357(a)(2), a CBP agent has the "power" to arrest someone without a warrant in the United States if the agent has "reason to believe" that the person is in the United States in violation of any immigration laws or regulations and "is likely to escape before a warrant can be obtained for his arrest."  8 U.S.C. § 1357(a)(2).[73]  Neither the language of § 1357(a)(2) nor argument or evidence in the

---

[73]     The statute provides in relevant part:

(a)     Powers without warrant

Any officer or employee of the Service authorized under regulations

(continued...)

record support Tsolmon's contention that § 1357(a)(2) imposes a nondiscretionary duty on CBP agents.[74]  *Cf. Sloan v. U.S. Dep't of Hous. & Urban Dev.*, 236 F.3d 756, 761 (D.C. Cir. 2001) (holding that "rules requir[ing] that certain conditions be met before a suspension may issue" did not convert the federal employee's decision to suspend the plaintiff into a nondiscretionary act because "[d]etermining whether those broadly stated conditions exist involves substantial elements of judgment").  Section

---

[73]        (...continued)

prescribed by the Attorney General shall have power without warrant—

\*      \*      \*      \*

(2)        to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States[.]

8 U.S.C. § 1357(a)(2).

[74]    Agent Wilson recognized that he had some discretion in his decision to issue the NTA, and that he made a decision to arrest Tsolmon because he thought it best given the lack of reliable documents that Tsolmon had legal status.  Tsolmon also argues that, in determining whether the requirements of § 1357(a)(2) were satisfied for a warrantless arrest, the CBP agents failed to consider certain factors outlined in the "Inspector's Field Manual of 2007."  *See* Plaintiff's Reply, at 7–8; Plaintiff's Motion, at 18–19; "Chapter 18–Inspector's Field Manual," Exh. D to Wilson's Depo. [Doc. # 29-1], at ECF page 124.  The Government disputes whether this manual applies to Agents Wilson and Stanley.  Assuming *arguendo* the manual applies to these agents, the manual provides additional factors to be considered in making the discretionary decisions; the manual does not dictate a specific course of conduct for the agents to follow.

1357(a)(2) thus does not prescribe a specific course of conduct that would render Agent Wilson's decision to issue the NTA nondiscretionary.

Tsolmon further argues that Agent Wilson violated § 1357(a)(2) because he lacked reason to believe Tsolmon was illegally present in the United States and that Agent Wilson failed to adequately consider if Tsolmon was a flight risk before issuing the NTA, thereby resulting in Tsolmon's improper arrest.   The Court does not condone any errors the CBP agents may have made in their investigation of Tsolmon's immigration status.   Nevertheless, their investigation was discretionary and the FTCA's discretionary function exception applies "whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).[75]

Some federal courts have held that a federal agent's decision during a criminal investigation is nondiscretionary when an agent allegedly engages in egregious acts intentionally and in bad faith to violate a federal law.[76]   Plaintiff's allegations,

---

[75]   *Accord St. Tammany Parish*, 556 F.3d at 322 n.9 (noting that "the FTCA may protect against abuses of discretion"); *Sutton*, 819 F.2d at 1298 (stating the discretionary function exception "protect[s] necessary, but necessarily imperfect, functions of government involving discretion on policy judgments and decisions from tort inspired judicial scrutiny"); *Medina*, 259 F.3d at 228 n.6 (explaining that the plaintiff would not be able to present an FTCA claim even if the agents in that case had abused their discretion).

[76]   *See, e.g.*, *Reynolds v. United States*, 549 F.3d 1108, 1113 (7th Cir. 2008) (holding the discretionary function exception did not apply to the defendant's alleged decision to submit a probable cause affidavit knowingly containing false information because "a federal investigator's decision to lie under oath is separable from the discretionary decision to prosecute"); *Moore v. Valder*, 65 F.3d 189, 197 (D.C. Cir. 1995) (holding that "[d]eciding whether to prosecute, assessing a witness's credibility to ensure that he is giving an accurate and complete account of what he knows, identifying the evidence to submit to the grand jury and determining whether information is 'exculpatory' and 'material' and therefore must be disclosed pursuant to a *Brady* request" are "quintessentially discretionary" but "[d]isclosing grand jury testimony to unauthorized third parties, however, is *not* a discretionary activity nor is it (continued...)

arguments, and evidence, however, viewed in the light most favorable to Plaintiff, theorize that the CBP agents made decisions based on incompetent investigation and errors in interpreting the allegedly available information.  Plaintiff's allegations and proof do not establish the egregious bad faith or intentional misconduct that courts have construed to be nondiscretionary conduct.

*Alleged Policy Violations.*— Tsolmon also contends that the agents' conduct was nondiscretionary because "[n]ot properly training CBP agents to conduct immigration status checks is not discretion" and "[n]ot having an adequate computer system that can verify someone's immigration status is not discretion."  Plaintiff's Surreply, at 9.  These allegations amount to failure to train or failure to provide an adequate computer database, theories that have not been pleaded or administratively exhausted.  Federal courts in other circuits "have consistently found that training, hiring, and personnel decisions were the sort contemplated by Congress when it promulgated the discretionary-function exception."  *Yan Zhao v. United States*, Civ. Action No. 06-CV-106S, 2013 WL 2945157, at *6 (W.D.N.Y. June 14, 2013); *see also Li v. Aponte*, Civ. Action No. 05 Civ. 6237(NRB), 2008 WL 4308127, at *8 (S.D.N.Y. Sept. 16, 2008) (collecting cases and explaining that "[p]ersonnel decisions of the United States generally fall within the discretionary function exception to the

---

76        (...continued)
          inextricably tied to matters requiring the exercise of discretion" (emphasis in
          original)); *Limone v. United States*, 271 F. Supp. 2d 345, 356 (D. Mass. 2003)
          (collecting cases and noting that courts have rejected discretionary function defenses
          in the face of allegations of suborning perjury and fabricating evidence); *see also
          Burgess v. Watson*, Civ. Action No. 1:12CV810, 2014 WL 4540256, at **3–4
          (M.D.N.C. Sept. 22, 2014) (collecting cases in which "[c]ourts have overwhelmingly
          found that claims of negligent investigation or negligent arrest by law enforcement
          officers are barred by the discretionary function exception" and explaining that "[i]t
          is only in cases involving egregious misconduct by federal agents that the
          [discretionary function] bar has not been applied").

FTCA").  Tsolmon cites no legal authority to support these theories as actionable FTCA violations.   Nor does he establish how these theories amount to a nondiscretionary CBP regulation or policy.  Tsolmon's unsupported assertions do not provide a basis for the Court to conclude that the discretionary function exception does not apply.  *Cf. Patty*, 2015 WL 1893584, at *3 ("[Plaintiff] cites no cases to support this argument and has 'waived the issue by failing to brief it adequately.'" (citing *Huff*, 555 F. App'x at 298)).  The Court rejects Plaintiff's contentions that inadequate training or computer systems are non-discretionary conduct by the agents or the United States.

*Alleged Constitutional Violation.*— Tsolmon originally argued that jurisdiction exists in this case because the CBP agents violated his rights under the Fourth Amendment of the United States Constitution and that a constitutionally impermissible act is nondiscretionary for purposes of § 2680(a).  At oral argument, Plaintiff abandoned the theory that the agents committed a constitutional violation. Therefore, this argument has been waived.  In any event, to the extent Tsolmon relies on the Fifth Circuit's statement in *Sutton v. United States*, 819 F.2d 1289 (5th Cir. 1987), that "we have not hesitated to conclude that such action does not fall within the discretionary function of § 2680(a) when governmental agents exceed the scope of their authority as designated by statute or the Constitution," *see Sutton*, 819 F.2d at 1293, the argument is unpersuasive.  The plaintiff in *Sutton* did not allege any constitutional claim, *see Sutton*, 819 F.2d at 1291, and thus this statement is mere *dicta*.  *See Patty*, 2015 WL 1893584, at *9.[77]  Further, the current state of the Fifth

---

[77]    It is well established that a waiver of sovereign immunity must be unequivocally expressed in the statute and "[a]ny ambiguities in the statutory language are to be construed in favor of immunity."  *Cooper*, 132 S. Ct. at 1448.  While the Supreme Court has consistently recognized that "the discretionary function exception will not

(continued...)

Circuit's jurisprudence on this issue is unclear[78] and it is questionable whether Tsolmon's theory is consistent with Supreme Court precedent, particularly in light of *F.D.I.C. v. Meyer*.[79]

---

[77]     (...continued)
apply when a federal statute, regulation, or policy *specifically* prescribes a course of action for an employee to follow," *Berkovitz*, 486 U.S. at 536 (emphasis added); *accord Gaubert*, 499 U.S. at 322, the Supreme Court has not expressly extended this reasoning to include the Constitution, *see Patty*, 2015 WL 1893584, at *9 (noting that "[t]he Constitution is conspicuously absent from this list").

[78]     In 2009, a divided panel of the Fifth Circuit held that "the district court legally erred in concluding that the discretionary function exception to the FTCA deprived it of jurisdiction without first determining whether the Agents' conduct was outside their scope of authority," *Castro v. United States*, 560 F.3d 381, 392 (5th Cir. 2009), but this panel decision was vacated upon rehearing en banc, *Castro v. United States*, 608 F.3d 266, 268 (5th Cir. 2010) (en banc) (per curiam).  To date, the Fifth Circuit has "not yet determined whether a constitutional violation, as opposed to a statutory, regulatory, or policy violation, precludes the application of the discretionary function exception."  *Spotts*, 613 F.3d at 569; *see also Lopez v. U.S. Immigration & Customs Enforcement*, 455 F. App'x 427, 434 (5th Cir. 2011) ("[w]e need not decide [the issue] here either" because plaintiffs' pleadings "[l]ack[ed] any plausible basis for a constitutional violation"); *Walding*, 955 F. Supp. 2d at 788.  *But see Santos v. United States*, Civ. Action No. 05-60237, 2006 WL 1050512, at *3 (5th Cir. Apr. 21, 2006) (per curiam) (unpublished) (affirming the district court's holding that a claim based on a violation of the Eighth Amendment does not fall outside the discretionary function exception because "the Eighth Amendment offers no help to [plaintiff] in this action because the government has not waived its immunity with regard to constitutional torts"); *Garza v. United States*, 161 F. App'x 341, 343 (5th Cir. 2005) (holding that the Eighth Amendment's prohibition against cruel and unusual punishment did not define a course of action "specific enough to render the discretionary function exception inapplicable").

[79]     Significantly, in *Meyer*, decided seven years after *Sutton*, the Supreme Court held that "the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims."  *Meyer*, 510 U.S. at 477.  The Supreme Court explained that the FTCA's waiver of sovereign immunity requires a tort claim to be brought in accordance with the law of the State where the alleged tort occurred and that "federal law, not state law, provides the source of liability for a claim alleging the deprivation

(continued...)

Based on the foregoing, the Court concludes that the challenged conduct in this case involves the agents' exercise of their discretion. Thus, the first prong of the *Gaubert* test for the discretionary function exception is satisfied.

### 3.   Prong Two: Whether the Agents' Decisions Were of the Kind the Discretionary Function Exception Was Designed to Shield

Having concluded that the first prong of the discretionary function exception to the FTCA is satisfied, the Court must now determine if, under the second *Gaubert* prong, the challenged conduct of the agents was based on considerations of public policy, and thus was the kind of conduct the discretionary function exception was designed to shield. *See Davila*, 713 F.3d at 263. The Government contends that CBP's decisions regarding investigations of citizenship and arrests are decisions the discretionary function exception is designed to shield, particularly when an alien does

---

[79]    (...continued)

of a federal constitutional right." *Id.* at 477–78. Reversing the Ninth Circuit, the Supreme Court also declined to extend the holding in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), to imply a constitutional tort cause of action for money damages directly against a federal agency, as opposed to a federal agent. *Id.* at 484. The Supreme Court reasoned that doing so "would mean the evisceration of the *Bivens* remedy, rather than its extension," by providing a mechanism for plaintiffs to sue federal agencies directly and thus bypass a federal agent's qualified immunity. *Id.* at 485.

Since *Meyer*, some circuit courts have recognized that a state tort claim may fall outside the discretionary function exception when a plaintiff plausibly pleads that a federal officer commits constitutional violation. *See Castro*, 608 F.3d at 271–72 n.1 (Stewart, J., dissenting to en banc ruling) (collecting cases). However, several of these cases involved allegations "complain[ing] of conduct [that] violated clearly established constitutional rights," *Linder v. McPherson*, Civ. Action No. 14-cv-2714, 2015 WL 739633, at *12 (N.D. Ill. Jan. 29, 2015) (and cases cited therein), and thus arguably are more consistent with the requirement for a violation of a "clearly established" constitutional right to overcome a government official's qualified immunity, *see Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).

not have documents in his possession showing his legal status. Defendant's Motion, at 23; *see* 8 U.S.C. § 1304(e). Plaintiff provides no substantive response. Rather, he counters simply by arguing the applicability of the FTCA's "law enforcement proviso," 28 U.S.C. § 2680(h). The Court addresses the law enforcement proviso separately below.

"[T]he proper inquiry under prong two" is not whether the CBP agents in fact engaged in a policy analysis when reaching their decisions to investigate, arrest, and detain Tsolmon but instead whether their decisions were "susceptible to policy analysis." *Spotts*, 613 F.3d at 572. "Because the purpose of the [discretionary function] exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." *Spotts*, 613 F.3d at 568 (quoting *Gaubert*, 499 U.S. at 323 (quoting *Berkovitz*, 486 U.S. at 537; *United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 814 (1984))) (internal quotation marks omitted). "In this regard, 'if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.'" *Spotts*, 613 F.3d at 568 (quoting *Gaubert*, 499 U.S. at 324). Further, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation." *Gaubert*, 499 U.S. at 325. Agent Wilson's intentions and strategies in investigating Tsolmon's immigration status and his personal beliefs about Tsolmon at the time thus are not relevant.

CBP is a unified federal law enforcement agency designed as "the nation's first comprehensive border security agency focused on securing [the United States']

borders while facilitating legal trade and travel."[80]  CBP is charged with enforcing hundreds of United States laws and regulations.  On a typical day, CBP must process over one million people traveling through the United States and may apprehend over one thousand individuals between U.S. ports of entry.[81]  The Border Patrol is more specifically tasked with detecting and preventing illegal entry of aliens into the United States.[82]  Federal courts have consistently held that law enforcement decisions regarding immigration and criminal investigations and arrests are "clothed in public policy considerations."[83]  "Operating with limited resources, [immigration authorities]

---

[80]   U.S. CUSTOMS & BORDER PROTECTION, VISION AND STRATEGY 2020: U.S. CUSTOMS AND BORDER PROTECTION STRATEGIC PLAN 6 (2015), *available at* http://www.cbp.gov/sites/default/files/documents/CBP-Vision-Strategy-2020.pdf.

[81]   About CBP, U.S. CUSTOMS & BORDER PROTECTION, http://www.cbp.gov/about (last visited Aug. 28, 2015); U.S. CUSTOMS & BORDER PROTECTION, SNAPSHOT: A SUMMARY OF CBP FACTS AND FIGURES (2015), *available at* http://www.cbp.gov/sites/default/files/documents/cbpsnapshot-20150403.pdf.

[82]   Border Patrol Overview, U.S. CUSTOMS & BORDER PROTECTION, http://www.cbp.gov/border-security/along-us-borders/overview (last visited Aug. 28, 2015).

[83]   *Medina*, 259 F.3d at 229 ("At bottom, the INS's decision to arrest [plaintiff] was clearly clothed in public policy considerations."). *See Mesa*, 123 F.3d at 1438 ("All of these factors indicate that the decision regarding how to locate and identify the subject of an arrest warrant is fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate."); *Castro v. United States*, Civ. Action No. C-06-61, 2007 WL 471095, at **8–9 (S.D. Tex. Feb. 9, 2007) (Jack, J,), *aff'd on reh'g en banc*, 608 F.3d 266, 268 (5th Cir. 2010) (per curiam) (holding that the border patrol's discretionary conduct regarding the decision to allow a minor United States citizen to accompany her undocumented alien father to Mexico was subject to policy analysis); *Crenshaw v. United States*, 959 F. Supp. 399, 402 (S.D. Tex. 1997) ("[Defendants'] decisions to take or refrain from certain actions were controlled by their desire to obtain this evidence.  Obviously, this objective correlates with the public policy goal of punishing and deterring those who violate federal laws."); *McElroy*, 861 F. Supp. at 592 ("[T]he Court finds that the discretion (continued...)

must weigh various policy considerations in deciding which suspected aliens to detain, how to detain them, and how to investigate claims of citizenship by detained aliens." *See Douglas*, 796 F. Supp. 2d at 1369. These policy concerns are especially prevalent when deciding whether to investigate or detain non-citizens who are traveling without documents proving their legal status. The CBP agents' discretionary actions in investigating Tsolmon's immigration status, interpreting the information received, and in deciding whether and when to issue an NTA charging Tsolmon were susceptible to policy analysis. Thus, the second prong of the discretionary function exception has been satisfied.

The Court, accordingly, concludes that the Government has satisfied both prongs of the *Gaubert* test for application of the FTCA § 2680(a) discretionary function exception to the conduct on which Plaintiff's negligence and false arrest/false imprisonment claims are based. These claims are barred by the discretionary function exception to the FTCA's waiver of sovereign immunity.

The Court next turns to Tsolmon's argument that, even if the discretionary function exception of § 2680(a) applies to this case, the United States has waived sovereign immunity for the claims in this case under the "law enforcement proviso" of § 2680(h).

### C.    Law Enforcement Proviso

Section 2680(h) contains an exception to the FTCA's waiver of sovereign immunity for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation,

---

[83]    (...continued)
exercised by the task force while conducting the investigation was guided by public policy considerations."); *Patty*, 2015 WL 1893584, at *10 ("Courts have consistently held that covert law-enforcement operations like the one at issue here are susceptible to policy analysis and covered by the discretionary function exception.").

deceit, or interference with contract rights."  28 U.S.C. § 2680(h).  The statute, however, permits suit against the United States for certain claims involving law enforcement officers' conduct:

> [W]ith regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and § 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h).[84]

The parties do not dispute that the CBP agents qualify as "law enforcement officers."[85]  Further, Plaintiff's false arrest/false imprisonment claim is an intentional tort enumerated in the law enforcement proviso of § 2680(h).  Tsolmon urges with respect to the law enforcement proviso that the Court find his negligence claim fits within the § 2680(h) exception to sovereign immunity.  Tsolmon's negligence claim is premised on largely the same conduct as his false arrest/false imprisonment claim. As noted above, all the questioned conduct is excluded from the FTCA's waiver of sovereign immunity under the discretionary function exception of § 2680(a).  The legal issue here, therefore, is whether the § 2680(h) law enforcement proviso waiver

---

[84]   The Supreme Court recently held that the law enforcement proviso "extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest."  *Millbrook v. United States*, 133 S. Ct. 1441, 1446 (2013).

[85]   *See Medina*, 259 F.3d at 224 ("We are satisfied that the INS agents involved meet this definition."); *Caban v. United States*, 728 F.2d 68, 72 (2d Cir. 1984) ("INS agents are 'investigative or law enforcement officers' within the meaning of [§ 2680(h)].").

of sovereign immunity extends to any claim arising from acts that are immune from suit under the discretionary function exception of § 2680(a).

The United States Supreme Court has not decided this issue and there is "disagreement among the circuits regarding the interaction between § 2680(a) and § 2680(h)." *Milligan v. United States*, 670 F.3d 686, 695 n.2 (6th Cir. 2012). The Eleventh Circuit has held that, whenever a plaintiff asserts a claim that arises out of an enumerated intentional tort in § 2680(h) against a law enforcement officer, sovereign immunity is waived under § 2680(h) of the FTCA and "there is no need to determine if the acts giving rise to it involve a discretionary function." *Ngyuen v. United States*, 556 F.3d 1244, 1257 (11th Cir. 2009). Most other circuits, however, have recognized that the plaintiff must clear the jurisdictional hurdle imposed by the discretionary function exception of § 2680(a) in order to assert a claim against a law enforcement officer under § 2680(h).[86]

---

[86]    *E.g.*, *Medina*, 259 F.3d at 226 ("We therefore conclude that the actions underlying intentional tort allegations described in § 2680(h), if authorized and implemented consistent with federal law and the Constitution of the United States, may be considered discretionary functions under § 2680(a), even if they would otherwise constitute actionable torts under state law."); *Gasho v. United States*, 39 F.3d 1420, 1435 (9th Cir. 1994) ("If a defendant can show that the tortious conduct involves a 'discretionary function,' a plaintiff cannot maintain an FTCA claim, even if the discretionary act constitutes an intentional tort under § 2680(h)."); *Gray v. Bell*, 712 F.2d 490, 508 (D.C. Cir. 1983) ("[W]e believe that [the plaintiff] must clear the 'discretionary function' hurdle *and* satisfy the 'investigative or law enforcement officer' limitation to sustain the malicious prosecution component of his FTCA claim." (emphasis in original)). District courts have also reached varying results. *Compare Paret-Ruiz v. United States*, 943 F. Supp. 2d 285, 290 (D.P.R. 2013) (highlighting the division among the circuits, that the First Circuit had yet to decide the issue, and concluding that "to the extent that Section 2680(a) and Section 2680(h) conflict, Section 2680(h) controls"), *with Barone v. United States*, Civ. Action No. 12 Civ. 4103 (LAK), 2014 WL 4467780, at **10–11 (S.D.N.Y. Sept. 10, 2014) (noting that "there is some tension between the exceptions outlined in 28 U.S.C. §§ 2680(a) (continued...)

The Fifth Circuit, in *Sutton v. United States*, 819 F.2d 1289 (5th Cir. 1987), adopted a middle ground.   *Sutton* requires courts to engage in a difficult and subjective analysis to try to "synthesi[ze] [ ] the policies behind §§ 2680(a) and (h) as applied to the specific facts of each situation."   *Sutton*, 819 F.2d at 1295.   *Sutton* instructs courts to "giv[e] effect to both [§§ 2680(a) and 2680(h)] in accordance with their legislative purpose" and that any conflicts between the sections "must be reconciled to achieve the legislative purpose expressed in the words of the statute and in light of existing law and policy behind the statute."   *Id.* at 1300.

The United States cites Fifth Circuit cases calling into question whether *Sutton* remains good law.[87]   *Sutton*, however, remains the only explicit guidance by the Fifth

---

[86]    (...continued)
and 2680(h) when a plaintiff asserts that federal investigative or law-enforcement officers committed an intentional tort in the course of carrying out a seemingly discretionary function, such as an investigation or arrest" and concluding that the discretionary exception yields to the law enforcement proviso when the alleged conduct crosses the line from negligent conduct to intentional misconduct or bad faith), *and Castro*, 2007 WL 471095, at *5 n.10, *9.

[87]    For instance, in 2010, in *Castro v. United States*, the Fifth Circuit, in an en banc per curiam decision, affirmed the district court's dismissal of plaintiff's claims under the discretionary function "essentially for the reasons given by the district court" and without any additional analysis.  *Castro*, 608 F.3d at 268.  The *Castro* district court noted in passing that the law enforcement proviso applied to several of the plaintiff's claims for assault, abuse of process, and false imprisonment asserted against Border Patrol agents but that dismissal was nevertheless warranted under the discretionary function exception.  *See Castro*, 2007 WL 471095, at *5 & n.9.  Neither the *Castro* district court nor the en banc Court of Appeals applied *Sutton* or attempted any similar balancing test designed to harmonize the underlying policies of §§ 2680(a) and 2680(h).  *See also Patty*, 2015 WL 1893584, at *13 ("The precise effect of the Fifth Circuit's recent en banc decision in *Castro v. United States*, 608 F.3d 266 (5th Cir. 2010) (en banc) (per curiam) on *Sutton* is unclear."); *Huff*, 555 F. App'x at 298 n.9 (noting in the analysis for the discretionary function exception, without any reference to § 2680(h), that "[r]egardless of whether [Plaintiff] purports to rely on a negligence theory or intentional-tort theory, the conduct underlying [Plaintiff's] FTCA claims
(continued...)

Circuit regarding the interplay between the discretionary function exception of § 2680(a) and the law enforcement proviso of § 2680(h). The Court, therefore, applies *Sutton*'s balancing test to determine if jurisdiction exists in this case as a result of § 2680(h), despite the bar that § 2680(a) imposes.[88]

The *Sutton* court pointed out that Congress's "primary motivation" for amending the FTCA to add the law enforcement proviso was to respond to "outrageous conduct by federal law enforcement officers and the indignities to which law abiding citizens had been subjected" to in raids in Collinsville, Illinois, where five to fifteen "shabbily dressed" narcotics officers "stormed" into innocent people's homes, forced them to lie on the floor with their hands tied, and pointed pistols at their heads while the officers searched their homes. *Sutton*, 819 F.2d at 1295–96 & n.11. On the other hand, the discretionary function exception, was designed "to protect the government from judicial second guessing" and extend sovereign immunity to decisions "'[w]here there is room for policy judgment.'" *Id.* at 1293 (quoting *Dalehite*

---

[87]    (...continued)
falls within the discretionary function exception" and that "[t]he exception does not depend on the inmate-plaintiff's theory"); *Santos*, 2006 WL 1050512, at *3 (affirming the district court's decision to dismiss the plaintiff's claims under the FTCA based on the reasoning that "[i]f a defendant can show that the tortious conduct involves a 'discretionary function,' a plaintiff cannot maintain an FTCA claim, even if the discretionary act constitutes an intentional tort under § 2680(h)" (citing *Gasho*, 39 F.3d at 1435)).

[88]    *See Camacho v. Cannella*, Civ. Action No. EP-12-CV-40-KC, 2012 WL 3719749, at *7 (W.D. Tex. Aug. 27, 2012) (applying *Sutton*'s balancing test because "*Sutton* remains the binding law in the Fifth Circuit because the Fifth Circuit did not explicitly or implicitly overrule *Sutton* in *Castro*"); *see also Patty*, 2015 WL 1893584, at **13–14 (noting that the precedential value of *Sutton* is "unclear" but "[a]ssuming that *Sutton*'s holding on the law enforcement proviso remains binding law after *Castro*"); *Hodgson*, 2014 WL 4161777, at *12 (citing *Camacho* and *Sutton* and noting that the law enforcement proviso "works in tandem with the discretionary function exception").

*v. United States*, 346 U.S. 15, 36 (1953)).  The Fifth Circuit reasoned that, while the discretionary function exception "protect[s] necessary, but necessarily imperfect, functions of government involving discretion on policy judgments and decisions from tort inspired judicial scrutiny," Congress enacted the law enforcement proviso to be "responsible to citizens who are injured by law enforcement officers in situations *like the Collinsville raids* when relief was otherwise unavailable."  *Id.* at 1298 (emphasis added).[89]

Subsequent Fifth Circuit cases attempting to harmonize §§ 2680(a) and 2680(h) emphasize a distinction between claims arising out of allegations of serious bad faith conduct or intentional misconduct and claims sounding in negligence or ineptitude.  For example, in *Nguyen*, an unpublished decision from the Fifth Circuit, officers of the Immigration and Naturalization Service ("INS") instituted deportation proceedings against a plaintiff and detained him for fifteen months before discovering that the plaintiff had a valid derivative claim to United States citizenship.  *Nguyen*, 65 F. App'x 509, 2003 WL 1922969, at *1.  In discussing the interplay of §§ 2680(a) and 2680(h), the *Nguyen* court found it significant that "the INS officers did not commit a constitutional violation nor did they engage in any conduct that could be described as in bad faith," and that "[n]o regulation or statute prevented the INS agents from pursuing deportation proceedings against [the plaintiff] based on the information available to them."  *Id.* at *2.  The *Nguyen* court concluded that the plaintiff's " detention [wa]s not of a character for which a court should refer to § 2680(h) for an exception to the discretionary function."  *Id.*  Similarly, in *Camacho v. Cannella*, the

---

[89]     In *Sutton*, the Fifth Circuit concluded that the district court had decided the case on factual allegations inadequate to perform the analysis and remanded the for the district court to determine how to harmonize the underlying policies of §§ 2680(a) and 2680(h) with the facts of that case.  *Sutton*, 819 F.2d at 1292.

district court held that "when the alleged conduct crosses the line from negligent conduct to intentional misconduct or bad faith, the discretionary exception yields to the law enforcement proviso, and the lawsuit can proceed." *Camacho*, 2012 WL 3719749, at *9 (citing *Ngyuen*, 65 F. App'x 509, 2003 WL 1922969, at *2; *Sutton*, 819 F.2d at 1293). The district court concluded that the plaintiff's allegations of "[l]ying and intentionally mischaracterizing evidence," were "the type of conduct that is actionable under FTCA." *Id.* at *10. The *Camacho* court, in distinguishing the facts of that case from *Nguyen*, explained that the plaintiff's allegations amounted to more than just allegations of negligence or that "an officer's investigation was sloppy or that an officer should have investigated the case more thoroughly." *Id.*[90]

In the case at bar, the Court has concluded in connection with § 2680(a) that the CBP agents' challenged conduct involved elements of judgment and choice, and was susceptible to policy analysis. *See supra* Part III(B)(2)–(3); *see also Gaubert*, 499 U.S. at 322. CBP agents must weigh many policy considerations when investigating an individual's claim to a valid visa and determining whether or not hold and to charge that person with being illegally present in the United States. Plaintiff Tsolmon (who admittedly did not have his immigration papers with him when questioned by the agents) contends that "[t]he government's failure to verify [his] valid immigration [status] was the result of negligence." Plaintiff's Motion, at 7. He further asserts that

---

[90] Courts in other circuits, while not expressly adopting *Sutton*'s balancing test, have reached similar conclusions regarding the scope of the discretionary function exception by finding that a federal investigative or law enforcement officer's otherwise discretionary conduct in a criminal investigation becomes nondiscretionary when he or she intentionally and flagrantly violates a federal law. *See supra* note 76. Under the reasoning in these cases, egregious acts in bad faith or intentional misconduct may be actionable under the FTCA, but allegations involving discretionary negligent conduct generally remain barred by the discretionary function exception.

41

this case is about "government error," *id.*, at 14, 15, "record keeping errors," *id.*, at 9, and "the system fail[ure]," *id.*, at 13.  *See also* Plaintiff's counsel's statements at oral argument held Aug. 25, 2015, *passim*.  Nowhere does Tsolmon allege or argue that the CBP agents' conduct in investigating his status and deciding to arrest him rose to the level of intentional misconduct or bad faith.  Accordingly, the Court concludes that, under the Fifth Circuit's balancing test in *Sutton*, the claims in this case are not of the kind that Congress intended to be actionable under the law enforcement proviso of § 2680(h).  Rather, these claims arise from discretionary conduct that Congress intended to except from the FTCA's waiver of sovereign immunity under § 2680(a).  As a result, the Court lacks subject matter jurisdiction over all of Plaintiff's claims.

## IV.   CONCLUSION AND ORDER

Plaintiff Tsolmon's detention and incarceration resulting from the CBP's prolonged investigation of his immigration status were extremely unfortunate and are not condoned by this Court.  The issue presented, however, is whether the alleged incompetent acts or errors by the CBP agents give rise to actionable claims against the United States under the FTCA.  Based on the foregoing, the Court concludes that Plaintiff's claims are barred by the discretionary function exception to the FTCA's waiver of sovereign immunity and are not within the law enforcement proviso waiver of sovereign immunity.  Because the Court lacks subject matter jurisdiction in this case, it is hereby

**ORDERED** that Defendant's Motion [Doc. # 28] is **GRANTED** as to dismissal of Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(1) and otherwise **DENIED as moot**.  It is further

**ORDERED** that Plaintiff's Motion [Doc. # 29] is **DENIED as moot**.  Finally, it is

**ORDERED** that Plaintiff's claims are **DISMISSED** for lack of subject matter

jurisdiction.

The Court will issue a separate final dismissal order.

SIGNED at Houston, Texas, this **28th** day of **August, 2015**.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE